**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

AQUAVIT HOLDINGS, LLC,

Plaintiff,

v.

HUONS BIOPHARMA CO., LTD.,

Defendant.

Civil Action No: 25-cv-748-RGA

**JURY TRIAL DEMANDED**

[redacted]

**PLAINTIFF AQUAVIT HOLDING, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

Dated: July 11, 2025

OF COUNSEL:

Michael DeVincenzo (*pro hac vice* forthcoming)
Charles Wizenfeld (*pro hac vice* forthcoming)
KING & WOOD MALLESONS LLP
500 5th Avenue, 50th Floor
New York, New York 10110
(212) 319-4755
michael.devincenzo@us.kwm.com
charles.wizenfeld@us.kwm.com

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 North Market St., 12th Floor
Wilmington, DE 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff*
*Aquavit Holdings, LLC*

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 2

III. ARGUMENT .......... 2

A. Plaintiff is Likely to Succeed on the Merits of its Breach of Contract Claim. .......... 3

1. Defendant's Invalid Termination of the LSA Does Not Excuse Its Breach .......... 4

2. Plaintiff Is Likely to Establish Defendant Breached the LSA .......... 13

3. Plaintiff Is Likely to Establish Defendant's Breaches Have Caused Harm .......... 14

B. Plaintiff Will Suffer Irreparable Harm Absent the Requested Relief .......... 16

C. The Balance of the Hardships Tips in Plaintiff's Favor .......... 19

D. The Public Interest Favors Granting a Preliminary Injunction .......... 20

IV. CONCLUSION .......... 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ECRI v. McGraw–Hill, Inc.*,
809 F.2d 223 (3d Cir. 1987)....................16

*EUSA Pharma (US), Inc. v. Innocoll Pharms. Ltd.*,
594 F. Supp. 2d 570 (E.D. Pa. 2009) .................... *passim*

*MarbleLife, Inc. v. Stone Resources, Inc.*,
759 F.Supp.2d 552 (E.D. Pa. 2010) ....................19, 20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
290 F.3d 578 (3d Cir. 2002)....................18, 19

*Phunware, Inc. v. Excelmind Grp. Ltd.*,
117 F. Supp. 3d 613 (D. Del. 2015)....................3

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017)....................2

*Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*,
138 F. App'x 431 (3d Cir. 2005) ....................18

*Siemens USA Holdings Inc. v. Geisenberger*,
17 F.4th 393 (3d Cir. 2021) ....................16

*Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*,
No. CV 21-00705-WCB, 2022 WL 605724 (D. Del. Jan. 25, 2022) ....................2

*The Research Foundation of State Univ. of New York v. Mylan Pharms. Inc.*,
723 F. Supp. 2d 638 (D. Del. 2010)....................18

**Other Authorities**

Federal Rules of Civil Procedure Rule 65 ....................1

## I. INTRODUCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Aquavit Holdings, LLC ("Plaintiff") respectfully moves this Court for a Preliminary Injunction to restrain and enjoin Defendant Huons BioPharma Co., Ltd. ("Defendant") from (1) continuing its refusal to cooperate with respect to Plaintiff's efforts to secure regulatory approvals to market and sell Defendant's Botulinum toxin Type A drug products ("Product(s)") pursuant to the parties' April 12, 2021 License and Supply agreement ("LSA"); and (2) continuing to violate the confidentiality provisions of the LSA.

This case arises from Defendant's deliberate and bad-faith campaign to undermine Plaintiff—its United States distribution partner for Botulinum toxin type A products (commonly referred to as BOTOX). In particular, Defendant seeks to wrongly and unlawfully reclaim control over the United States market despite Plaintiff's exclusive license and after Plaintiff had made substantial investments in pursuit of regulatory approval for such Products and paid Defendant for the exclusive rights to sell Product(s) in the United States and Canada. Under the LSA, Plaintiff is responsible for and in charge of securing regulatory approval with respect to the Products, and Defendant is required to assist Plaintiff with its efforts by providing data and information requested for the approval of the Product(s).

Over the last four years, Plaintiff has expended [redacted] laying the regulatory and commercial groundwork for distribution of the Products in the United States and secured over [redacted] in funding in support of its efforts. Despite Plaintiff's efforts, Defendant began a campaign to terminate the LSA based on vague, pretextual accusations, designed to avoid Defendant's obligations under the LSA. Defendant further refused to provide essential data required for regulatory approval and obstructed Plaintiff's efforts to move its Investigational New Drug (IND) application forward based on a grossly overbroad audit demand that it was not

entitled to under the LSA, and which it offered to withdraw if Defendant would enter a new agreement separate from the LSA.

When Plaintiff did not agree to replace the LSA with a new agreement, Defendant cancelled the LSA without providing Plaintiff proper notice or an opportunity to cure any alleged breaches as required under the LSA. Defendant then publicly disclosed Plaintiff's trade secrets and confidential regulatory plans—violating multiple LSA provisions—allowing it to explore relationships with competing distributors behind Plaintiff's back. This motion seeks to ensure the status quo can be maintained while the parties' dispute regarding the LSA is resolved.

Plaintiff seeks injunctive relief requiring Defendant's continued cooperation as Plaintiff seeks regulatory approval and to preclude further disclosure of Plaintiff's confidential and trade secret information in violation of the LSA.

## II. LEGAL STANDARD

A preliminary injunction may issue where the movant demonstrates: "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured …if relief is not granted." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). If these "gateway factors" are met, courts then consider "(3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id*. at 176, 179. Thus, the court must determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*. at 179; *see also Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*, No. CV 21-00705-WCB, 2022 WL 605724, at *3 (D. Del. Jan. 25, 2022) (citing *Reilly*, 858 F.3d at 179).

## III. ARGUMENT

Plaintiff requests injunctive relief requiring Defendant to comply with its obligations under the LSA, including providing critical regulatory materials necessary for Plaintiff to obtain FDA approval and commercialize the licensed product. Plaintiff also seeks to enjoin Defendant from making any further disclosures of confidential information in violation of the LSA. Without immediate Court intervention, Plaintiff will continue to suffer irreparable reputational and business harm that cannot be remedied through damages alone. The requested relief is essential to preserve the status quo and protect the integrity of the parties' contractual relationship pending final adjudication.

**A. Plaintiff is Likely to Succeed on the Merits of its Breach of Contract Claim.**

To prevail on a breach of contract claim under Delaware law, a plaintiff must establish: (1) the existence of a valid contract; (2) a breach of an obligation imposed by that contract; and (3) resulting damages to the plaintiff. *Phunware, Inc. v. Excelmind Grp. Ltd.*, 117 F. Supp. 3d 613, 625 (D. Del. 2015). As an initial matter, there is no dispute that the LSA is a valid and enforceable contract between the parties. *See generally,* Ex. 2[1], LSA; D. I. 1 ("Non-Party Aquavit[2] Action"), *Huons BioPharma Co., Ltd. v. Aquavit Holdings, LLC*, 1:25-cv-00636-RGA, (D. Del. 2025) at ¶¶ 13, 14 and 47.)

Defendant has breached the LSA by wrongfully declaring it terminated without regard to the LSA's provisions regarding notice and cure (*see* Ex. 2, Sections 3.5, 17.2(a) and 17.2(b)) and by publicly disclosing the LSA in violation of the provisions prohibiting disclosure of confidential information, (*see id,* Sections 15 and 16.3). Further, based on Defendant's wrongful

---

[1] "Ex. __" refers to the exhibits to the contemporaneously-filed Declaration of Michael S. DeVincenzo.

[2] The Defendant in the Non-Party Aquavit Action is a Nevada LLC and a separate legal entity from Plaintiff in this case and is not a party to the LSA.

termination, Defendant is no longer assisting with Plaintiff's regulatory efforts with respect to the Product. As such, Defendant is in further violation of: (1) Section 12.1 of the LSA by refusing to cooperate in good faith under the LSA in connection with Plaintiff's efforts to acquire regulatory approval for the Product(s); and (2) Section 12.3 of the LSA by refusing to continue to provide all materials and documentation requested by Plaintiff to register the Product in the U.S.

There is no reasonable dispute that Defendant is no longer complying with the LSA. Defendant purported to terminate the LSA on April 11, 2025. Ex. 3, April 11, 2024 Letter (purportedly terminating LSA); Ex. 4, May 23, 2025 Letter at 1-2 (confirming Defendant's termination, Defendant's refusal to discuss cure and demanding return of all information provided by Defendant). Further, on May 22, 2025, Defendant filed an action against Non-Party Aquavit who is not a party to the LSA, seeking, *inter alia*, a declaratory finding that Defendant's termination of the LSA was effective. (D. I. 1, Non-Party Aquavit Action.) Separately, Defendant has demanded Plaintiff comply with the Defendant's termination request including by stopping its regulatory efforts and returning information to Defendant. (Ex. 4, at 1-2.) As it stands, Defendant is in breach of the LSA unless its termination of the LSA was valid and effective.

**1. Defendant's Invalid Termination of the LSA Does Not Excuse Its Breach**

Defendant's attempted termination of the LSA was not valid and it is unlikely the Court will ultimately determine otherwise. As Defendant detailed in the Non-Party Aquavit Action, Defendant's termination is based on Plaintiff's alleged breach of: (1) Section 7.5 of the LSA by "failing to allow Plaintiff to verify compliance with the LSA" (2) Section 9.2 of the LSA by failing "four years ago" to provide an acceptable "Trial Plan"; and (3) Section 12.1 of the LSA by "withholding material correspondence" from the United States Food & Drug Administration ("FDA") and "failing to confirm" the FDA possessed certain information. (D. I. 5, Non-Party

Aquavit Action, Brief in Support of TRO at 6-7.) Defendant is unlikely to establish breach of any of the above provisions. At an absolute minimum, Defendant is unlikely to establish that at the time of termination Plaintiff had been provided an opportunity to cure any such alleged breaches after receiving sufficient notice of same, as expressly required under the LSA.

As detailed below, Defendant's claims of breach in the Non-Party Aquavit Action fly in the face of its own allegations from that action and the parties' correspondence which evidence Defendant worked with counsel in an attempt to manufacture a breach where none existed, unreasonably failed to negotiate, and failed to provide sufficient notice and/or an opportunity to cure.

**a. Plaintiff Did Not Breach Section 7.5 of the LSA**

Defendant has alleged Plaintiff breached Section 7.5 of the LSA by frustrating an audit. Defendant requested to "verify compliance" with the LSA. D. I. 5, Non-Party Aquavit Action, Brief in Support of TRO at 6-7. Defendant is unlikely to succeed in establishing: 1) that a breach of Section 7.5 occurred; and 2) that any such breach was incurable at the time of Defendant's unilateral termination of the LSA on April 11, 2025.

Defendant's attempt to manufacture a breach began on November 22, 2024, when Defendant alleges an audit request was sent by Defendant's litigation counsel, Mr. Phillips, a person unknown to Plaintiff. Non-Party Aquavit Action, D. I. 1 at ¶29; Ex. 5, November 22, 2024 Letter from Phillips to Aquavit Pharmaceuticals Inc. Plaintiff did not learn of this request until January 24, 2024. Ex. 1, Declaration of Sobin Chang ("Chang Decl.") ¶ 21.

The audit request letter is not a reasonable audit request as it is facially overbroad. The request seeks all documents in any way connected to the LSA from the execution of the LSA in April of 2021 until November 2024, which includes all privileged and protected information and all internal and external communications. Ex. 5 at 1-2. Defendant is not entitled to such

information under the LSA and Plaintiff did not breach the LSA by refusing to immediately provide protected and privileged information upon learning of the request. Indeed, it is not commercially reasonable to expect a party to immediately produce all documents related to an ongoing four-year agreement regardless of privilege and confidentiality.

Mr. Phillips's audit request was not only unreasonable on its face, but it was also inconsistent with the parties' discussions and agreements. Prior to November 22, 2024, the parties discussed and agreed that Defendant was not entitled to all confidential correspondence with regulatory agencies [redacted]. Chang Decl., ¶¶ 19-20. Further, Defendant and Plaintiff have repeatedly communicated directly with respect to Plaintiff's ongoing efforts to obtain regulatory approval for the Product. *Id.* at ¶¶ 13-22. At no point did Defendant urge that it was entitled to all privileged, confidential, internal and external documents related to the LSA as requested in its audit request.

Aquavit learned of Defendant's unreasonable audit request on January 24, 2025. Chang Decl., ¶21; Non-Party Aquavit Action, D.I. No. 1 at ¶32. On January 28, 2025, Plaintiff promptly responded to Defendant's unreasonable audit requests and threats of breach. Ex. 6, January 28, 2025 Letter from Plaintiff to Defendant. In particular, Plaintiff explained that it had "already disclosed all required FDA feedback," referencing the parties' agreement regarding such feedback, Chang Decl., ¶¶19-20, and further explained Defendant had no right to the requested privileged and/or protected information.

In response, Defendant did not attempt to justify the overbroad demands detailed in its November 22, 2024 correspondence. To the contrary, on February 11, 2025, Defendant offered to withdraw its demand for an overly broad audit but only if Plaintiff would enter a new "detailed agreement" with a new list of required deliverables. Ex. 7, February 11, 2025 Letter to Plaintiff.

Defendant requested a response in a week to its demand to enter a new agreement or face an unreasonable demand for audit. *Id.* As of February 11, 2025, Defendant had failed to articulate a reasonable request for audit and Plaintiff had not refused to comply with any reasonable request for information Defendant was entitled to under the LSA. Chang Decl., ¶¶21-22.

Two weeks later, Mr. Kim, Defendant's CEO, followed up alleging Plaintiff's failure to respond to Defendant's February 11, 2025 communication about "avoiding the audit" and seeking a new agreement was a material breach of the audit provision (Section 7.5) of the LSA itself. Ex. 8, February 26, 2025 E-mail at 1. Mr. Kim did not otherwise respond to Defendant's correspondence regarding the overly broad nature of the November audit request. *Id.*

As of February 26, 2025, Defendant had not disputed the only audit request received was overbroad and had not identified any specific information reasonably required under the LSA that had not been already disclosed. With respect to correspondence with the FDA, Plaintiff has provided verbatim recitation of the information contained in FDA correspondence that Defendant is entitled to under the LSA. Chang Decl., ¶ 22. Plaintiff has further offered to provide FDA correspondence redacted for protected information. *Id.* Rather than discuss or negotiate its overbroad audit request or provide Plaintiff a reasonable time to respond to any particularized request, Defendant presented an ultimatum that Plaintiff either renegotiate the LSA (and thereby avoid the audit request) or be declared in breach of the LSA. Ex. 7 at 1; Ex. 8 at 1. Defendant is unlikely to establish that Plaintiff breached Section 7.5 of the LSA by refusing to enter into a new agreement or refusing any reasonable audit request after being provided a reasonable amount of time to comply.

In its rush to terminate the LSA, Defendant failed to provide proper notice of a reasonable audit request and a reasonable opportunity to respond. Defendant alleged that Mr.

Phillips's November 22, 2024 letter is proper notice of a reasonable audit request under the LSA. However, that letter was addressed to Aquavit Pharmaceuticals, Inc. and allegedly sent by "e-mail and postal mail" to Plaintiff's point of contact in the LSA. Non-Party Aquavit Action, D. I. 1 at ¶29; Ex. 5, November 22, 2024 Letter from Phillips to Aquavit Pharmaceuticals Inc. Pursuant to the LSA, postal notice is not sufficient, and e-mail notice is only sufficient upon receipt of confirmation. Ex. 2, LSA, Section 23. Mr. Phillips did not receive e-mail confirmation in November 2024. DeVincenzo Decl. at ¶12. Instead, Mr. Phillips first received confirmation that Plaintiff received its overly broad audit request on January 28, 2025 and without discussing or negotiating the overbroad audit request, Defendant then declared Plaintiff in immediate breach without discussion when Plaintiff would not renegotiate the LSA.

Further, Plaintiff will likely succeed in establishing that the alleged breach of Section 7.5 was subject to "cure" at the time Defendant terminated the LSA on April 11, 2025. On April 12, 2025, Plaintiff indicated the alleged breach of Section 7.5 of the LSA was subject to cure. Ex. 9, April 12, 2025 Letter at 1. Defendant responded to Plaintiff's request on May 23, 2025. Rather than discuss a cure in good faith or the scope of its audit request, Defendant filed a complaint against Non-Party Aquavit. Ex. 4 at 1. Pursuant to Section 17.2 of the LSA, Plaintiff was entitled to 180 days to cure any non-material breach and any breaches concerning timing and notice. Ex. 2, Section 17.2. Plaintiff still had a right to cure the alleged breach of Section 7.5 when Defendant unilaterally cancelled the LSA on April 11, 2025. Of course, Plaintiff could not and cannot unilaterally cure Defendant's overbroad audit request without Defendant's participation which Defendant refused to provide unless Plaintiff agreed to renegotiate the LSA.

In view of the foregoing, Defendant is unlikely to be successful in justifying its termination based on its assertion that Plaintiff frustrated a reasonable request for audit in breach

of Section 7.5 after being provided a reasonable opportunity to respond and an opportunity to cure.

### b. Plaintiff Did Not Breach Section 9.2 of the LSA

Defendant's second purported justification for its refusal to comply with the terms of LSA is also unlikely to succeed. Defendant asserts that Plaintiff breached Section 9.2 of the LSA by failing to "notify [Defendant] of the plan and timeline for conducting clinical trials" in ***June 2021***, as required under that provision. D.I. No. 5, Non-Party Aquavit Action, Brief in Support of TRO at 7. Plaintiff requested the June 2021 plan and timeline in January 2025, and declared a material breach without articulating any aspect of Plaintiff's plans for FDA approval and clinical trials that was insufficiently disclosed. Plaintiff has provided numerous, repeated updates regarding Plaintiff's plans for clinical trials which have not begun because of Defendant's failure to provide necessary information. Chang Decl., ¶¶8-19.

The timeline for beginning clinical trials is necessarily dependent [redacted]. As explained in the attached declaration of Ms. Chang, Defendant's awareness of Plaintiff's present plans for FDA approval should not be in dispute as the parties repeatedly discussed Plaintiff's plan and timeline in numerous in-person and teleconference meetings. For example, on October 11, 2023, shortly after Plaintiff met with the FDA to discuss Plaintiff's attempts to secure regulatory approval, [redacted] *Id*. at ¶15. In this meeting, Plaintiff explained that [redacted], [redacted] *Id.* at ¶¶13-15. Plaintiff reiterated this plan to Defendant on

February 8, 2024 and June 12, 2024. *Id.* at ¶¶16-19. On June 12, 2024, the parties had an in-person meeting [redacted]. During that meeting, Defendant represented that it would provide the requested materials to Plaintiff by the end of November 2024. *Id.* at ¶19. Defendant did not provide the requested updated information until February 4, 2025, only a few days before Defendant alleged Plaintiff was in material breach of Section 9.3. Ex. 7.

Defendant is aware and has been notified of the plan and timeline for clinical trials and no breach of Section 9.2 has occurred. Indeed, to the extent Defendant believed its knowledge or awareness of Plaintiff's June 2021 plan and timeline was insufficient, there is no excuse for Defendant's decision to wait until February 2025 to raise such an issue and then immediately terminate the LSA when Plaintiff would not negotiate a new LSA. To be clear, Plaintiff is not and has not refused to disclose its June 2021 plan and timeline. Instead, Defendant first raised an issue with respect to the notification received regarding Plaintiff's June 2021 plan in 2025 and almost immediately declared Plaintiff in breach of the LSA and purported to terminate the LSA for alleged deficiencies in Plaintiff's June 2021 notification. Tellingly, Defendant has not identified what information regarding Plaintiff's June 2021 plan was not properly disclosed and/or how or why such unidentified additional information regarding Plaintiff's June 2021 plan would serve any useful purpose at this time. To the extent Defendant alleges it is unaware of Plaintiff's present plans and timelines, Plaintiff is not withholding aspects of its plans and timeline and instead has consistently provided updates of its plans and timeline repeatedly as part of its efforts to get regulatory approval for the Products. *Id.* at ¶¶9-19. At bottom, Defendant is unlikely to be successful in urging termination of the agreement was justified based on the alleged failure of Plaintiff to provide notification of its plans and timelines.

Further, Plaintiff will likely succeed in establishing that the alleged breach of Section 9.2 was subject to "cure" at the time Defendant terminated the LSA on April 11, 2025. Section 9.2 of the LSA provided Plaintiff two months to notify Defendant of its plan and timeline for clinical approval. *See* Ex. 2, Section 9.2. As detailed above, in response to Defendant's attempt to immediately cancel the LSA, Plaintiff promptly notified Defendant of its ability to cure any such breach on April 12, 2025. Ex. 9, April 12, 2025 Letter at 1. Defendant failed to cooperate with respect to Plaintiff's offer to cure and, instead, declared the breach incurable. Ex. 4 (urging Plaintiff's offer to cure on April 12, 2025 came too late).

As it stands, Defendant has failed to articulate what aspect of Plaintiff's June 2021 plan and timeline was insufficient, or what aspect of Plaintiff's future plan and timeline it does not know about. The LSA specifically permits Plaintiff to cure breaches for up to 180 days after receiving proper notice. *See* Ex. 2, Section 9.2. Defendant had no basis for terminating the LSA under Section 9.2 on April 12, 2025, as Plaintiff plainly did not have proper notice regarding any alleged breach and had not been provided an opportunity to cure any such breach. In view of the foregoing, Defendant is unlikely to be successful in justifying its termination based on its assertion that Plaintiff breached Section 9.2.

**c. Plaintiff Did Not Breach Section 12.1 of the LSA**

Defendant's third basis for terminating the LSA is also unlikely to be successful. With respect to Section 12.1 of the LSA, that provision requires the parties [redacted] Ex. 2, Section 12.1. Defendant has asserted Plaintiff breached this provision by withholding "material correspondence with the FDA." D.I. No. 5, Non-Party Aquavit Action, Brief in Support of TRO at 7. In fact, Plaintiff is unaware of any information [redacted] with respect to any correspondence with the FDA that is not already in Defendant's possession.

As Plaintiff explained upon receipt of Defendant's overbroad audit request: "Aquavit has already shared the FDA's regulatory feedback verbatim, in accordance with the agreed-upon process from [the Parties'] in-person meeting." Ex. 6, January 28, 2025 Letter Plaintiff to Defendant at 2. On June 12, 2024, the parties met, discussed FDA correspondence, and agreed on a process for disclosure of FDA correspondence. In particular, Plaintiff agreed to provide verbatim recitation of the relevant portions of the FDA correspondence but not restricted portions. Chang Decl., ¶¶18-20. Plaintiff has provided such information. *Id.* at ¶22.

Plaintiff has not refused any specific request for any information [redacted] D.I. No. 5, Non-Party Aquavit Action, Brief in Support of TRO at 7. Plaintiff specifically offered to provide complete FDA correspondence with redactions for protected information that was not required to be disclosed under the agreement. Chang Decl., ¶22. When Plaintiff did not accept Defendant's offer to renegotiate the LSA, Defendant declared Plaintiff in material breach and terminated the LSA without bothering to request, let alone review, redacted correspondence. *See* Exs. 8 and 9.

Additionally, Defendant is unlikely to establish that Plaintiff engaged in a breach of Section 12.1 that was not subject to "cure" at the time it terminated the LSA on April 11, 2025. Section 12.1 requires the provision of information and recognizes the parties will work in "good faith," without identifying a timeline for the provision of information. Ex. 2, Section 12.1. Nonetheless, Defendant alleged breach of Section 12.1 in early 2025 without acknowledging the parties' prior discussions and/or responding to Plaintiff's statement that the "FDA's regulatory feedback was shared verbatim." Ex. 6 at 1. Instead, Defendant simply declared a material breach in February and terminated the LSA on April 11, 2025. Ex. 3. Defendant's general request for additional information is readily curable. Despite this, Defendant has failed to discuss Plaintiff's

offer of redacted correspondence and failed to specify what aspect of Plaintiff's disclosure regarding FDA correspondence is deficient. In these circumstances, Defendant is unlikely to establish that any alleged breach of Section 12.1 was not subject to cure as of April 11, 2025.

* * * * *

Accordingly, Defendant's refusal to comply with the terms of the LSA is unlikely to be excused based on Plaintiff's alleged breaches of the LSA.

**2. Plaintiff Is Likely to Establish Defendant Breached the LSA**

Plaintiff is likely to be successful in establishing Defendant's breach of the confidentiality disclosures of the LSA. The LSA provides that each [redacted] Ex. 2, LSA, § 16.3. The LSA further specifies that [redacted] Ex. 2, LSA, § 15.3.

Following Defendant's rush to terminate the LSA and without responding to Plaintiff's offer to cure any alleged breaches, on May 22, 2025 Defendant filed the Non-Party Aquavit Action, and the next day—the Friday before Memorial Day weekend—sought a temporary restraining order ("TRO") against Non-Party Aquavit. *See* D.I. Nos. 1 and 5, Non-Party Aquavit Action. Defendant attached an unredacted copy of the LSA to its Complaint and its TRO filings and thereby breached the LSA. *See, e.g.*, LSA, § 16.3. The terms of the LSA are confidential and include information related to Plaintiff's confidential legal arrangements with Defendant, development milestones, regulatory strategy, and royalty structures. Chang Decl., ¶¶ 25-28; D.I. No. 7, Non-Party Aquavit Action at 2-3 (recognizing value of confidential LSA and dangers of disclosure). Public disclosure of this information has harmed and will continue to harm Plaintiff. Chang Decl., ¶¶ 25-28. Indeed, soon after the public filing of the LSA, media reports were

[redacted]

*Id.* at ¶26. These same media reports contain damaging statements attributable to Defendant regarding Plaintiff and the LSA. *Id.*

Following the public filing of the LSA, on June 4, 2025, Plaintiff informed Defendant the LSA on the public docket was in violation of Defendant's confidential obligations. Ex. 10, June 3, 2025 E-mail at 1. [redacted]

Plaintiff is likely to be successful in establishing Defendant failed to keep the [redacted] and thereby has breached the LSA. Defendant's breach appears intentional and, coupled with the damaging remarks made against Plaintiff, designed to harm Plaintiff's reputation. Defendant was not required to publish the terms of the LSA in order to comply with any applicable law and Defendant failed to provide reasonable advance notice prior to its disclosure of the terms of the LSA. Ex. 2, LSA, § 15.3. It appears that as part of its business strategy, Defendant wanted to exploit the litigation as a means to publicly disclose Plaintiff's sensitive commercial terms, milestones, and FDA strategy — not in compliance with any legal requirement, but as retaliation for Plaintiff's refusal to renegotiate or walk away from the LSA.

**3. Plaintiff Is Likely to Establish Defendant's Breaches Have Caused Harm**

Defendant's breaches have caused and will continue to cause Plaintiff substantial harm thus satisfying the last element of Plaintiff's breach of contract claim. Relying on Defendant's

obligation under the LSA, Plaintiff has expended considerable time and resources to secure FDA approval of the Product. For example, Plaintiff has expended [redacted], communicated in detail with the FDA for several years and set up plans for clinical approval of the Product. Chang Decl., ¶¶23-24, 30. Now, Defendant intends to terminate the LSA, nullifying Plaintiff's extensive efforts over the last four years based on allegations of breaches made because Plaintiff would not agree to renegotiate the LSA.

Further, Defendant's conduct has imposed significant opportunity costs on Plaintiff, including delay in entering the U.S. pharmaceutical market, lost funding, lost revenue potential and lost leverage in negotiations with future partners. Most crucially, Defendant's failure to provide requested information has not only delayed FDA approval but if allowed to continue will certainly result in no FDA approval for the Product. *Id.* at ¶29. Additionally, Defendant's breach of the LSA's confidentiality provisions has harmed Plaintiff. Defendant's unlawful public filing of the LSA has already resulted in media outlets publishing the confidential competitive information of Plaintiff contained in the LSA which plainly harms Plaintiff in future dealings with potential partners. The public disclosure of Plaintiff's information was coupled with public remarks disparaging Plaintiff's performance under the LSA evidencing an attempt to harm Plaintiff in the marketplace. Chang Decl., ¶¶ 25-28.

As a result of Defendant's unreasonable actions and to prevent the continued harm to Plaintiff and delays in the regulatory approval process, Plaintiff has been forced to pursue legal action and to incur additional costs to protect its rights. Indeed, without Defendant's cooperation the entire approval process for the Product will be jeopardized.

* * *

For these reasons, Plaintiff has demonstrated a strong likelihood of success on the merits of its breach of contract claim, satisfying the first prong of the preliminary injunction standard.

**B. Plaintiff Will Suffer Irreparable Harm Absent the Requested Relief.**

Plaintiff will suffer irreparable harm if Defendant is permitted to disregard its obligations under the LSA based on its manufactured claims of breach, and its refusal to reasonably negotiate a cure.

In this Circuit, to establish irreparable harm, "the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Siemens USA Holdings Inc. v. Geisenberger*, 17 F.4th 393, 408 (3d Cir. 2021) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992)). The harm must be "immediate" and "irreparable." *EUSA Pharma (US), Inc. v. Innocoll Pharms. Ltd.*, 594 F. Supp. 2d 570, 581 (E.D. Pa. 2009). In the context of a breach of contract claim, irreparable harm may be found where: (1) the subject matter of the contract is of such a special nature that damages would be inadequate; or (2) it is impracticable to ascertain the measure of money damages due to the contract's special or complex features. *See ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

Both circumstances are present here. Defendant has breached and will continue to breach its obligations to assist Plaintiff in securing FDA approval, stripping Plaintiff of its exclusive license to the Product under the LSA. Indeed, as Defendant itself has asserted, "[d]rug registration and commercialization by a foreign entity in the U.S. is a specialized, high-stakes endeavor. It is impossible to quantify the cost or burden of submitting an NDA." *See* D.I. 5, Non-Party Aquavit Action at 8.

Further, frustrating a plaintiff's attempt to secure FDA approval for entry into the U.S. market constitutes the loss of a "unique, non-replicable business opportunity" that supports a

finding of irreparable harm. *EUSA Pharma*, 594 F. Supp. 2d at 582 (*citing Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 163 (3d Cir. 1999)). That is exactly the type of irreparable harm that would be inflicted here in the absence of an injunction. In *EUSA Pharma*, the plaintiff "requested a preliminary injunction to prevent [defendant] from beginning a clinical trial that might trigger [plaintiff's] option to purchase the exclusive license to commercialize a product being developed by [defendant]." 594 F. Supp. 2d at 573. The court explained that "[i]f [defendant's] refusal prevents [plaintiff] from exercising the Option, [plaintiff] will suffer irreparable harm by losing 'a unique, non-replicable business opportunity.'" *Id.* at 582 (quoting *Allegheny Energy, Inc.*, 171 F.3d at 163). The court explained that "given the uncertainty of FDA approval and future market conditions, the [drug product's] commercial value cannot be calculated without speculation." *Id*. This applies with equal force here, as the ability to distribute the Product(s) represents a "unique, non-replaceable business opportunity" for Plaintiff but the FDA approval being sought is of an uncertain nature reflecting that the commercial value of the Product cannot be determined without speculation at this time.

Additionally, losing control over the development of one's own business plan is a well-recognized irreparable harm. For example, in *EUSA Pharma*, the court noted that the plaintiff was contractually entitled to oversee the development of defendant's pharmaceutical product. 594 F. Supp. 2d at 581. In particular, the court noted that the defendant's "planned course of action would immediately terminate [plaintiff's] authority to oversee the [drug product's] development during Phase II [clinical trial]," and that "[o]nce the development occurs without [plaintiff's] participation, no legal action could provide a remedy for the loss." *Id*. Here, the LSA expressly grants Plaintiff [redacted]

[redacted]. If Defendant does not abide by the LSA with respect to the approval process for the Product, Plaintiff will lose control over the ability to direct and control the approval process, as Plaintiff cannot secure FDA approval for the Products without information from Defendant–the manufacturer and developer of the Products. Chang Decl., ¶29. In such circumstances, the harm to Plaintiff would be irreparable.

Moreover, as recognized by Defendant, the "loss of market share in the pharmaceutical industry may constitute an irreparable harm" and supports maintaining the status quo in this action. *See* D.I. No. 5, Non-Party Aquavit Action at 9; *see also The Research Foundation of State Univ. of New York v. Mylan Pharms. Inc.*, 723 F. Supp. 2d 638, 658 (D. Del. 2010); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a potential harm which cannot be redressed by a legal or an equitable remedy following a trial.") (citations omitted) (internal quotation marks omitted); *Ride the Ducks of Philadelphia, LLC v. Duck Boat Tours, Inc.*, 138 F. App'x 431, 434 (3d Cir. 2005) (citing *Novartis* to hold that "the loss of market share may be an irreparable injury.")). Absent the requested preliminary injunction, Plaintiff will be certain to have no share in the market for the Product in the short term. Instead, at best, Plaintiff will be forced to wait until the conclusion of this action to regain Defendant's cooperation and continue with the approval process which will necessarily delay FDA approval and harm the market share for any Products to an unquantifiable degree.

Finally, the irreparable harm is immediate, as Defendant is attempting to terminate the LSA and strip Plaintiff of its exclusive license. *See EUSA Pharma*, 594 F. Supp. 2d at 581 (finding that the plaintiff "show[ed] a threat of immediate harm because [defendant] clearly intends to begin the OLSS [Clinical Trial] immediately and not to recognize [plaintiff's] Option once that occurs.").

Accordingly, Plaintiff has met the second prong of the preliminary injunction standard.

**C. The Balance of the Hardships Tips in Plaintiff's Favor**

Before granting an injunction, a court "must balance the relative harm to the parties, *i.e.,* the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis*, 290 F.3d at 596. Here, if the Court denies the requested injunction, Plaintiff will suffer greater harm than granting the injunction would cause Defendant. Indeed, the requested injunction would not harm Defendant at all; it would simply require Defendant to abide by terms of a contractual agreement with which it already agreed to abide. *See EUSA Pharma*, 594 F. Supp. 2d at 583 (finding plaintiff established balance of equities tipped in its favor because "a preliminary injunction will harm [defendant] only by preventing it from violating the Agreement."); *MarbleLife, Inc. v. Stone Resources, Inc.*, 759 F.Supp.2d 552, 563 (E.D. Pa. 2010) (citing *Pappan Enter. v. Hardee's Food Sys., Inc.*, 143 F.3d 800 (3d Cir. 1998)) (finding balance of hardships tipped in favor of plaintiff because potential harm alleged by defendant was "at least partially self-inflicted[,] [b]y failing to renew the Agreement and subsequently failing to adhere to [its] post-termination obligations."). On the other hand, as detailed above, the potential harm to Plaintiff should Defendant be permitted to refuse cooperation under the LSA is significant–including the potential loss of market access, reputational injury, and disruption of FDA approval efforts. This potential harm to Plaintiff

significantly outweighs any potential harm to Defendant that an injunction could cause, and Plaintiff has thus satisfied the third prong of the preliminary injunction standard.

**D. The Public Interest Favors Granting a Preliminary Injunction**

Enforcing the terms of the LSA serves the public interest. In a breach of contract action, "the public interest favors enforcing valid contracts and making parties live up to their agreements." *MarbleLife*, 759 F. Supp. 2d at 563. Here, Defendant agreed to abide by the LSA, and the public would benefit from Defendant living up to that agreement. *See id*. at 563–64. Preventing Defendant from breaching its agreement to cooperate with Plaintiff in the FDA approval process also serves the public interest. *See EUSA Pharma*, 594 F. Supp. 2d at 583 (finding public interest favored granting preliminary injunction because "preserving the status quo will protect the integrity of the clinical trial process for the B-Implant" for which FDA approval was being sought).

Accordingly, the public interest supports issuance of the requested injunctive relief.

**IV. CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court issue a preliminary injunction enjoining Defendant from (1) refusing to cooperate with respect to Plaintiff's efforts to secure regulatory approvals to market and sell the Product pursuant to the LSA; and (2) continuing to violate the confidentiality provisions of the LSA. While Plaintiff reserves its rights to pursue all available remedies concerning Defendant's breach and improper disclosures, the immediate relief sought here is necessary to preserve regulatory integrity and prevent ongoing disclosures of Plaintiff's protected information. This preliminary relief requested is also necessary to preserve Plaintiff's contractual rights and prevent irreparable harm to its regulatory, financial, and commercial interests.

Dated: July 11, 2025

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Aquavit Holdings, LLC*

Of Counsel:

Michael S. DeVincenzo
Charles Wizenfeld
King & Wood Mallesons LLP
500 5th Avenue, 50th Floor
New York, New York 10110
(212) 319-4755
michael.devincenzo@us.kwm.com
charles.wizenfeld@us.kwm.com